## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Clear Blue Specialty Insurance Company,
and Everspan Indemnity Insurance Company,

                    Plaintiffs,

     v.

OSOM Products Inc., Jason Keats, Emmett
Hollyer, Wolfgang Muller, Anatoly Yakovenko,
and Solana Labs, Inc.,

                    Defendants.

Civil Action No.

**COMPLAINT FOR
DECLARATORY RELIEF**

 

Plaintiffs, Clear Blue Specialty Insurance Company ("Clear Blue") and Everspan Indemnity Insurance Company ("Everspan"), by and through their respective undersigned counsel, for their Complaint for Declaratory Judgment against Defendants OSOM Products Inc. ("OSOM"), Jason Keats ("Keats"), Emmett Hollyer ("Hollyer"), Wolfgang Muller ("Muller"), Anatoly Yakovenko ("Yakovenko"), and Solana Labs, Inc. ("Solana"), allege as follows:

## INTRODUCTION

1. This is an action for declaratory judgment and other relief, brought pursuant to 28 U.S.C. §§ 2201 and 2202, for the purpose of resolving an actual controversy between the parties regarding their respective rights and obligations under two consecutive liability insurance policies that Clear Blue (the "Clear Blue Policy") and Everspan (the "Everspan Policy") issued to OSOM.

2.  Specifically, Clear Blue and Everspan each seeks a declaration that it does not have any defense or indemnity obligation(s) under the Clear Blue Policy and the Everspan Policy, respectively, with respect to the Defendants' alleged liability as to a Books and Records Demand (as defined herein), a Books and Records Action (as defined herein) and a Derivative Action (as defined herein).

## THE PARTIES

3.  Clear Blue is a Texas domiciled insurance company, with its principal place of business in Dallas, Texas. Clear Blue is authorized to transact the business of insurance within the State of New York.

4.  Everspan is an Arizona domiciled insurance company, with its principal place of business in New York, New York. Everspan is authorized to transact the business of insurance within the State of New York.

5.  Upon information and belief, defendant OSOM is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Cupertino, California.

6.  Upon information and belief, defendant Keats is the Chief Executive Officer ("CEO") and director of OSOM and a citizen of California.

7.  Upon information and belief, defendant Hollyer is a former director of OSOM and citizen of Illinois.

8.  Upon information and belief, defendant Muller is a former officer and director of OSOM and citizen of California.

9.  Upon information and belief, defendant Yakovenko is a former director of OSOM and citizen of California.

2

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action, pursuant to 28 U.S.C. §§ 2201 and 2202, insofar as Clear Blue and Everspan each seeks a declaration of its rights and duties under the Clear Blue Policy and the Everspan Policy, respectively.

11. Jurisdiction is also conferred by 28 U.S.C. § 1332(a) because complete diversity exists between the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12. Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391, because Everspan issued one of the insurance policies at issue, and it has its principal place of business within this District, and further, the parties transacted business in New York with respect to the policies at issue and the Defendants' claims for coverage thereunder.

## BACKGROUND

13. Upon information and belief, Keats founded OSOM, a developer of smartphones, on or around April 20, 2020.

14. Upon information and belief, in late 2020 or early 2021, Muller joined OSOM's Board of Directors (the "Board").

15. Upon information and belief, beginning in early 2021, Keats used OSOM to fund his lifelong interest in cars, such as sponsoring car racing teams.

16. Upon information and belief, significant sponsorship expenses were incurred for the principal reason that Keats wanted to be a race driver with OSOM footing the bill.

17. Upon information and belief, OSOM sponsored racing not for business purposes or brand awareness, but rather so that Keats could fulfill his desire to be a race driver.

18. Upon information and belief, OSOM spent staggering figures from 2021 through March 2024 on marketing-related sponsorships.

19. Upon information and belief, OSOM also paid racing related travel expenses for Keats to regularly travel to racing tournaments including business class flights, hotels and dining.

20. Upon information and belief, OSOM's funds were dwindling by mid-2022, in large part because of Keats' reckless self-interested spending.

21. Upon information and belief, OSOM secured a transformational investment from Solana, which involved multiple Solana-related entities and numerous closing documents.

22. Upon information and belief, OSOM entered into an agreement with Solana in June 2022, wherein OSOM agreed to produce an exclusive cryptocurrency smartphone for Solana (foregoing development of the OSOM-brand smartphone) in exchange for an investment of cash and cryptocurrency and Solana received a significant stake in OSOM's newly issued Series A-1 shares of preferred stock and a seat on the OSOM Board (the "Solana Agreement").

23. Upon information and belief, pursuant to the Solana Agreement, OSOM amended its charter, resulting in the Board containing three members, with one director elected by the holders of Series A Preferred Stock (the "Preferred Director"), and two directors elected by the holders of common stock (the "Common Directors").

24. Upon information and belief, Solana Labs designated Yakovenko to the Board as a Preferred Director.

25. Upon information and belief, after the Solana Agreement, Keats and Muller were added to the Board as the Common Directors.

26. Upon information and belief, OSOM successfully produced the smartphone for Solana, called the Solana Saga, which could transact cryptocurrency and as a result, OSOM received tens of millions of dollars' worth of cryptocurrency assets ("SOL Tokens").

27. Upon information and belief, beginning in 2023, Muller began suggesting that Keats had been using OSOM funds for himself.

28. Indeed, Muller subsequently testified that Keats "liked to brag a lot about, you know, the two yachts that he had purchased or had built and that he was going to have in Barcelona .... The $5 million of supercars that he had on order, the Pagani. ... So just a lot of little things like that that weren't adding up, specifically since ... three years ago we were both ... saying we'd have to find a job if we didn't ... find capital soon. ...Towards the end of 2023, Jason had been bragging to literally the entire company, not just about his racing of Lamborghinis but, you know, yachts we has purchasing, houses, cars, like all this stuff, and I think everyone was just like, where's he getting all this money, specifically when bonuses weren't getting distributed properly to the employees."

29. Keats himself testified that there was no Board meeting, policy or "formal process for deciding when to sell" SOL tokens.

30. Upon information and belief, beginning on July 14, 2023, Keats began selling SOL Tokens – two weeks after the lockup period ended.

31. Upon information and belief, without any oversight of the Board, Keats also unilaterally decided to stake the SOL Tokens between August 2022 and April 2024 without discussing the action with the Board or Preferred Stockholder Yakovenko.

32. Upon information and belief, nearly half a million dollars in staking proceeds is unaccounted for.

33. Upon information and belief, Keats personally profited from OSOM's staking.

34. To that end, Muller testified "[Keats] actually bragged about, one morning, the interest he made off of the staking of Solana. I think the number he said was, 'I made $7,000 this morning.'"

35. Muller further testified that OSOM's head of finance told Muller that he "had never seen any money come back except for $200,000 that came back during [into Silicon Valley Bank], where funds had come back into our actual USD treasury. So there was just a lot of unknowns with the staking."

36. Upon information and belief, Keats increased the budget for "Sales & Marketing" from just under a million dollars for Fiscal Year ("FY") 2022 to five million dollars for FY 2023, despite there being no legitimate business purpose for this level of marking spend in 2023 as Solana had the exclusive right to market and sell the Solana Saga, and OSOM was prevented from developing any other smartphone.

37. Upon information and belief, in 2023, at Keats' direction, OSOM paid Keats an amount each month ostensibly to "rent" a place to work at his house between $12,500 and $13,500 a month.

38. However, Muller testified that over the course of half a year he rarely saw anyone working from the house.

39. Upon information and belief, Keats also used a corporate OSOM credit card to pay for miscellaneous self-interest personal expenses, such as a dining table for his home.

40. Upon information and belief, in late 2023, Solana Mobile began taking pre-orders for the Solana Saga Two and secured more than 130,000 pre-orders at $500 per phone (*i.e.*, at least $65 million in preorders), despite not yet having a release date.

41. Upon information and belief, in November 2023, Solana Mobile held talks with OSOM regarding the manufacturing of the Solana Saga Two.

42. Upon information and belief, On December 1, 2023, OSOM and Solana Mobile executed another statement of work governing the production of the Solana Saga Two.

43. Upon information and belief, at some point prior to March 2024, Yakovenko stepped down from the Board.

44. Upon information and belief, Solana replaced Yakovenko with Hollyer to try and limit Yakovenko's litigation exposure.

45. Upon information and belief, following Hollyer's appointment to the Board in early March 2024, the Board scheduled a Board meeting for March 18, 2024.

46. Upon information and belief, in preparation for the Board meeting, a member of Solana's legal team sent Hollyer (cc'ing Keats and Muller) a "sample board deck" to use for the upcoming meeting on March 12, 2024.

47. Upon information and belief, Keats shared a not-yet approved proposed FY 2024 budget.

48. Upon information and belief, on March 14, 2024, Hollyer began raising questions via email regarding OSOM's written expense reimbursement policy and approval process for expense reimbursement, contracts relating to the car-racing marketing and sponsorships, and the records for AMEX repayment ACH system.

49. To that end, Muller testified that Hollyer, at the Board meeting, had voiced "Solana's concerns about not just Jason spending company money to sponsor his racing ... but they were also concerned about him spending money to fly first class to race on company money."

50. Muller further testified that Hollyer, at the Board meeting, "asked about the staking rewards ... and Jason said that he was using it for spot bonuses for employees."

51. Upon information and belief, Muller sent Hollyer a "debrief document" titled "Observations Board Meeting 3/18," which Muller wrote "Solana brought up concerns on Marketing Spend specifically around racing."

52. Upon information and belief, on or around March 22, 2024, Keats and Muller met with Hollyer and Solana's general counsel, whereby Solana's general counsel made it very clear they would not be moving forward with the Solana Saga Two, despite securing 130,000 fully paid pre-orders for the phone, and discussed Solana's separation from OSOM.

53. Upon information and belief, Keats told OSOM's executives on or around May 1, 2024, that Solana was threatening to sue OSOM and Keats personally unless its money was returned.

54. Upon information and belief, contemporaneous written correspondence exists wherein Keats told Muller that Solana's general counsel threatened a lawsuit.

55. Upon information and belief, on or around May 20, 2024, Keats announced the termination of certain OSOM employees, including Mary Ross ("Ross").

56. Upon information and belief, on or around May 27, 2024, Keats unilaterally removed Muller from OSOM's Board of Directors.

57. Upon information and belief, on May 6, 2024, Muller was laid off as Chief Marketing Officer.

58. Upon information and belief, around June 10, 2024, Keats unilaterally arranged a buyout of Solana, wherein OSOM would pay Solana to exit its position via a stock repurchase

agreement and OSOM would sell Solana certain intellectual property (the "Solana Exit Transaction").

59. Upon information and belief, no financial advisor assisted in the sale of the intellectual property.

60. Upon information and belief, as a result of the Solana Exit Transaction, Hollyer resigned and Solana surrendered the board seat it acquired pursuant to the terms of the Solana Agreement.

61. On or around August 16, 2024, non-party and former OSOM employee and officer Ross sent a letter to OSOM's Board seeking to inspect certain of OSOM's books and records (the "Books and Records Demand").

62. The Books and Records Demand sought "to investigate potential wrongdoing and/or mismanagement in connection with executive compensation, payments made to Keats and for his hobbies and luxury lifestyle, misuse of the SOL Tokens and the proceeds thereof, a failure by the Board to remedy the foregoing, and potential breaches of fiduciary duty in connection with the Solana Exit Transaction."

63. On or around August 27, 2024, Ross filed a Verified Complaint to Compel Inspection of Books and Records under 8 Del C. §220 in the Delaware Chancery Court, captioned *Mary Ross v. OSOM Products, Inc.*, Case No. 2024-0894, (the "Books and Records Action"). (A true and correct copy of the public version of the Books and Records Action is attached hereto as **Exhibit 1**).

64. On or around October 11, 2024, Ross filed a Complaint (the "Derivative Complaint") in the Delaware Court of Chancery, captioned *Mary Ross, Derivatively on Behalf of OSOM Products, Inc., v. Jason Keats, Emmett Hollyer, Wolfgang Muller, Anatoly Yakovenko, and*

*Solana Labs, Inc., and OSOM Products, Inc. (as Nominal Defendant)*, Case No. 2024-1045 (the "Derivative Action"). (A true and correct copy of the public version of the Derivative Complaint is attached hereto as **Exhibit 2**).

65. The allegations in the Derivative Complaint are alleged to be based on Ross' own knowledge and her own actions, and otherwise upon information and belief as to allegations developed through the investigation conducted by her attorneys, including but limited to a review of corporate books and records produced and deposition testimony elicited in connection with the Books and Records Action.

66. The Derivative Complaint alleges that in early 2024, Hollyer objected to Keats' reckless spending and began investigating what happened with the Solana tokens.

67. The Derivative Complaint further alleges that, as a result of the forgoing, Solana stated that it would not continue to work with OSOM despite accepting 130,000 pre-orders for the next version of the OSOM-built phone and attending several meetings with OSOM executives and engineers and demanded its full investment back.

68. The Derivative Complaint alleges that Keats arranged to buy out Solana via the Solana Exit Transaction.

69. The Derivative Complaint alleges that Keats informed OSOM's C-suite executives and wrote to one of his fellow directors that Solana had threatened to file litigation against OSOM and Keats personally.

70. The Derivative Complaint alleges that Keats ignored Muller's concerns and executed a written consent to remove Muller from the Board.

71. The Derivative Complaint further alleges that the Solana Exit Transaction was finalized in June 2024.

72. The Derivative Complaint alleges that the Solana Exit Transaction set OSOM on the downward path to dissolution.

73. The Derivative Complaint alleges that Keats spent the majority of OSOM's remaining funds to buy Solana's silence about Keats' misconduct, and that he advised stockholders that "[i]n light of being unable to raise an additional funding round, OSOM is shutting down."

74. On or around April 29, 2025, Ross filed the operative Amended Complaint (the "Amended Complaint") in the Derivative Action. (A true and correct copy of the public version of the Amended Complaint is attached hereto as **Exhibit 3**).

75. The Amended Complaint, in relevant part, alleges breach of fiduciary duty against Keats, Muller, Yakovenko, and Hollyer in connection with allowing Keat's financial expenditures with OSOM money, the Solana Exit Transaction, the sale of the Solana Tokens, and other corporate governance failures. (The Derivative Complaint and the Amended Complaint will hereinafter be referred to as the "Derivative Action.")

76. Upon information and belief, Ross was previously employed as OSOM's former Chief Privacy Officer ("CPO").

### OSOM's Tender for Coverage

77. On or around September 30, 2024, OSOM provided first notice of the Books and Records Action to Embroker Insurance Services, LLC ("Embroker"), an insurance broker and claims administrator. OSOM included the Books and Records Demand as an exhibit, and its cover email listed the Everspan Policy only.

78. On or around October 14, 2024, OSOM provided first notice of the Derivative Complaint (and a related motion) to Embroker.

79. On or around October 29, 2024, after receipt and review of the allegations set forth in the Books and Records Demand, the Books and Records Action and the Derivative Complaint, Everspan (via Embroker) issued a coverage position letter in response to Defendants' claim for coverage under the Everspan Policy ) (the "Everspan Position Letter").

80. The Everspan Position Letter specifically informed OSOM of the various grounds under which coverage was limited or precluded for the Books and Records Demand, the Books and Records Action and the Derivative Action, including but not limited to the Everspan Policy's "Insured v. Insured" exclusion (described below), the "Conduct" exclusion," (described below) and OSOM's failure to disclose the matters to Everspan during the underwriting process (as described below). Everspan also reserved the right to amend/supplement its position and to assert additional defenses to coverage.

81. On or around November 21, 2024, OSOM's attorney sent a letter to Everspan (via Embroker) in response to the Everspan Position Letter (the "Pushback Letter").

82. In the Pushback Letter, OSOM's counsel asserted Defendants' position that the Clear Blue Policy is the applicable policy responsive to the Books and Records Demand, the Books and Records Action and the Derivative Action.

83. In response to the Pushback Letter and in a good faith attempt to resolve the dispute, Clear Blue agreed to consider the matter under the Clear Blue Policy as requested by OSOM, while reserving all rights.

84. On or around January 22, 2025, Clear Blue issued its own coverage position letter in response to Defendants' claim for coverage under the Clear Blue Policy (the "Clear Blue Position Letter").

85. The Clear Blue Position Letter specifically cited the "Insured v. Insured" exclusion (described below) and Defendants' breach of the Clear Blue Warranty (as described below) as bases for disclaiming coverage. Clear Blue also reserved the right to amend/supplement its position and to assert additional defenses to coverage.

86. Subsequent correspondence ensued between Clear Blue, OSOM, Keats, and the other director Defendants regarding the Clear Blue Position Letter.

87. The parties attempted to reach a resolution to resolve the coverage dispute, but were unsuccessful.

88. As such, an actual, present, and justiciable controversy has arisen and now exists between the Plaintiffs and the Defendants and regarding their respective rights, duties, and obligations (if any) under the subject Clear Blue Policy and the subject Everspan Policy.

## THE CLEAR BLUE POLICY

89. Clear Blue issued the Clear Blue Policy, bearing Policy number AX01-5099-02 to OSOM for the policy period July 21, 2023 to September 19, 2024. (A true and correct copy of the Clear Blue Policy is attached hereto as **Exhibit 4**).

90. Subject to its terms and conditions, the Clear Blue Policy provides claims-made-and-reported Directors, Officers & Organization ("D&O") insurance, and contains liability limits of $3,000,000.

91. The Clear Blue Policy is subject to a $50,000 retention for each **Claim**[1] under Insuring Agreements B, C and D, and no retention for **Claims** under Insuring Agreement A.

92. The Clear Blue Policy's D&O Coverage Part Insuring Agreement A. provides that Clear Blue "will pay **Non-Indemnifiable Loss** on behalf of the **Insured** resulting from a **Claim**

---

[1] Terms in **bold** shall have the same meaning as attributed to such terms in the Clear Blue Policy and/or the Everspan Policy.

first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period and reported to us pursuant to the terms of this Policy, for a **Wrongful Act** by the **Insured**."

93. The Clear Blue Policy defines "**Employee**," in relevant part as "any natural person whose labor or service was, is or shall be engaged and directed by the **Insured Organization**, including full-time, part-time, seasonal, leased and temporary employees."

94. The Clear Blue Policy defines "**Executive**," in relevant part, as "any natural person who was, is or shall be a duly elected or appointed: 1. Director, officer, or member of the board of the managers or management committee of the **Insured Organization**."

95. The Clear Blue Policy defines "**Insured Organization**," in relevant part, as the "**Named Insured**; and any **Subsidiary**."

96. The Clear Blue Policy defines "**Interrelated Wrongful Acts**" as "**Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes."

97. The Clear Blue Policy defines "**Related Claim**" as "all **Claims** arising out of a single **Wrongful Act**."

98. The Clear Blue Policy's "**Related Claims**" provision provides, in relevant part the following: "**Related Claims**. If **Related Claims** are subsequently made against you and are reported to us, all such **Related Claims**, whenever made, will be considered a single **Claim** and such **Claim** will be deemed to have been made on the date the first of those **Claims** was made against the **Insured**. All **Related Claims** shall be subject to the same Retentions and Limits of Liability applicable to the earlier **Related Claim**."

99. The Clear Blue Policy's D&O Coverage Part Insuring Agreement A. provides that Clear Blue "will pay **Non-Indemnifiable Loss** on behalf of the **Insured** resulting from a **Claim** first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period and reported to us pursuant to the terms of this Policy, for a **Wrongful Act** by the **Insured**."

100.    The Clear Blue Policy defines "**Insured**" under the D&O Coverage Part as, in relevant part, "[w]ith respect to Insuring Agreement A and E, **Team Members**."

The Clear Blue Policy defines "**Team Member**" under the D&O Coverage Part as, in relevant part, as any "**Executive**; or **Employee**."

100. The Clear Blue Policy defines "**Wrongful Act**" under the D&O Coverage Part as, in relevant part, as "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by: [a] **Team Member** in their capacity as such or in an **Outside Capacity**; [a] **Team Member** in their capacity as a **Controlling Person** or as a **Selling Shareholder**; or [w]ith respect to Insuring Agreement C, the **Insured Organization**."

101. The Clear Blue Policy also contains the following relevant "Insured vs. Insured" and "Conduct" exclusions that provide in parts as follows:

> **IV.    Exclusions**
>
> For the purpose of determining the applicability of any Exclusion set forth in this Exclusions Section, the **Wrongful Act**, knowledge of, or facts pertaining to any **Team Member** shall not be imputed to any other **Team Member**; and only the **Wrongful Act** by the Chief Executive Officer or functionally equivalent of any **Insured Organization** shall be imputed to the **Insured Organization**.

We shall not be liable under this **Coverage Part** to pay any **Loss** on account of that portion of any **Claim** made against you:

\*\*\*

### F. Insured versus Insured

For any **Claim** brought or maintained by or on behalf of:

1. an **Insured Organization**;
2. a **Team Member** in any capacity; or
3. an **Outside Entity** arising out of an **Insured's** service in an **Outside Capacity**;

Provided this exclusion does not apply to:

1. **Defense Costs** covered under Insuring Agreement A…

\*\*\*

### H.  Personal Profit & Illegal Conduct

For any personal profit, remuneration, or financial advantage to which an **Insured** is not legally entitled; or

For any willful violation of any law, statute or regulation, or any deliberately fraudulent or criminal act, error, or omission committed by an **Insured**;

If evidenced by a final and non-appealable adjudication adverse to the **Insured** in the underlying action.

102. In or around July 2024, Clear Blue (and Embroker) and OSOM/Keats engaged in renewal discussions as the Clear Blue Policy approached its expiration date of July 21, 2024.

103. On or around July 30, 2024, Keats executed the "No Known Loss Warranty" as CEO of OSOM (the "Warranty") and submitted it to Clear Blue (via Embroker). (A true and correct copy of the Warranty is attached hereto as **Exhibit 5**).

104. The Warranty provides the following in pertinent part:

The undersigned authorized officer represents and warrants, that after inquiry of all directors, officers and employees of the Named

16

Insured and any of its affiliates, subsidiaries who may be Insureds under the Policy and to the best of his, her or their knowledge, that:

1. There has not been nor is there now pending any Claims, demand, suit, government inquiry, or action against any Insured; and

2. No Insured has knowledge of any fact, act, error, or omission which could give rise to a Claim under the Policy.

The Insured understands and agrees that if any Claim, demand, suit or action against any Insured exists or is now pending or if any Insured has knowledge of any fact, act, error, or omission which could give rise to a Claim under the Policy, whether or not disclosed in response to this Statement, that any Claim arising from such demand, suit, action, fact, act, error, or omission is excluded from coverage under the Policy.

It is understood and agreed that the Insurer is relying upon this Statement as material to underwriting, and that if any such claims, suits or actions referred to in paragraph 1 above exist, or any knowledge or information referred to in paragraph 2 above exists, then any Claim arising therefrom is excluded from the Policy.

It is agreed that this Statement will be attached to and become part of the Policy in the same manner as the Application.

105. Thus, pursuant to the terms of the Warranty, Keats agreed that if any claim, demand, suit or action against any **Insured** existed or was then pending, or if any **Insured** had knowledge of any fact, act, error, or omission which could give rise to a **Claim** under the Clear Blue Policy, whether or not disclosed in response to the Warranty, any such **Claim** arising from such demand, suit, action, fact, act, error, or omission would be excluded from coverage under the Clear Blue Policy.

106. In reliance of Keats' representations in the Warranty, Clear Blue extended the Clear Blue Policy for another sixty (60) days.

**THE EVERSPAN POLICY**

107. Everspan issued the Everspan Policy, bearing Policy number EM3EII-AX-002768-01 to OSOM for the policy period of September 19, 2024 to September 19, 2024. (A true and correct copy of the Everspan Policy is attached hereto as **Exhibit 6**).

108. Subject to its terms and conditions, the Everspan Policy provides claims-made-and-reported Directors, Officers & Organization ("D&O") insurance, and contains liability limits of $1,000,000.

109. The Everspan Policy is subject to a $50,000 retention for each **Claim** under Insuring Agreements B, C and D, and no retention for **Claims** under Insuring Agreement A.

110. The Everspan Policy contains the same material definitions, exclusions, and conditions as the Clear Blue Policy, but for the **Policy Period** and Limits of Liability.

111. The Everspan Policy defines "**Application**" as "all written materials and information, including signed applications and any information attached thereto, incorporated therein, submitted, or made available by or on behalf of you to us in connection with the underwriting of this Policy or any other policy issued by us, which this Policy is a renewal or replacement. The **Application** is deemed attached to and incorporated into this Policy.

112. The Everspan Policy contains an Application condition, that provides:

**XIV.    Application**

You represent and acknowledge that the statements and information contained in the **Application** are true, accurate, and complete, and are the basis of this Policy and are considered incorporated into and constituting a part of this Policy.

This Policy is issued in reliance upon the truth and accuracy of the **Application**.

If the **Application** contains misrepresentations or omissions that materially affect the acceptance of the risk or the hazard assumed by us, this Policy

18

shall not afford coverage for any **Insured** who knew on the inception date of this Policy the facts that were not truthfully disclosed in the **Application**, whether or not the **Insured** knew the **Application** contained such misrepresentation or omission.

For the purpose of determining coverage, knowledge possessed by:

1.     Any **Team Member** shall not be imputed to any other **Team Member**; and

2.     [T]he **Insured Organization's** Chief Executive Officer, functionally equivalent, or anyone signing the **Application** shall be imputed to the **Insured Organization**.

113. In or around August 2024, Everspan (and Embroker) and OSOM/Keats engaged in negotiations for the purchase of the Everspan Policy as the Clear Blue Policy approached its expiration date of September 19, 2024.

114. On or around August 28, 2024, Keats executed a "Management Liability Application" as CEO of OSOM (the "Application"). (A true and correct copy of the Application is attached hereto as **Exhibit 7**).

115. Despite questions specifically encompassing such issues in the Application, Keats neither disclosed the Books and Records Demand, nor the Books and Records Action, nor the possibility/likelihood of OSOM going bankrupt within the next year.

116. In reliance of Keats' representations in the Application (among other underwriting submissions, including the Warranty), Everspan issued the Everspan Policy.

## COUNT I – DECLARATORY RELIEF[2]
### (The Books and Records Demand, Books and Records Action, and Derivative Action Constitute a Single Claim under the Clear Blue Policy)

117. Plaintiffs restate and incorporate by reference each and every allegation set forth in the preceding paragraphs as though set forth in full herein.

118. The Books and Records Demand, dated August 16, 2024 sought to investigate alleged wrongdoing and/or mismanagement in connection with executive compensation, payments made to Keats and for his hobbies and luxury lifestyle, misuse of the SOL Tokens and the proceeds thereof, a failure by the Board to remedy the foregoing, and potential breaches of fiduciary duty in connection with the Solana Exit Transaction.

119. The allegations in the Derivative Action are based on Ross' own knowledge and her own actions, and otherwise upon information and belief as to allegations developed through the investigation conducted by her attorneys, including but limited to a review of corporate books and records produced and deposition testimony elicited in connection with the Books and Records Action.

120. The Derivative Action alleges breach of fiduciary duty against Keats, Muller, Yakovenko, and Hollyer in connection with allowing Keat's financial expenditures with OSOM money, the Solana Exit Transaction, the sale of the Solana Tokens, and corporate governance failures.

121. The Books and Records Demand, the Books and Records Action, and the Derivative Action arise out of the same **Wrongful Acts**.

---

[2] Plaintiffs allege/assert their various coverage defenses in the alternative, as permitted by the Federal Rules of Civil Procedure (and the applicable Local Rules).

122. Indeed, the Books and Records Demand, the Books and Records Action, and the Derivative Action are **Related Claims**, which are considered a single **Claim** with one limit of liability, deemed to have been made on the date the first of those **Claims** was made against Keats and OSOM.

123. Thus, the Books and Records Demand, Books and Records Action, and Derivative Action collectively constitute a single **Claim**, first made on August 16, 2024 – during the Clear Blue Policy's **Policy Period**.

124. Accordingly, and for the reasons set forth herein, Clear Blue is entitled to a declaration that the Books and Records Demand, the Books and Records Action, and the Derivative Action collectively constitute one single **Claim** under the Clear Blue Policy.

## <u>COUNT II – DECLARATORY RELIEF</u>
### <u>(The Books and Records Demand, Books and Records Action, and Derivative Action Constitute a Single Claim that was Made Prior to the Everspan Policy's Policy Period)</u>

125. Plaintiffs restate and incorporate by reference each and every allegation set forth in the preceding paragraphs as though set forth in full herein.

126. As demonstrated herein, the Books and Records Demand, the Books and Records Action, and the Derivative Action arise out of the same **Wrongful Acts**.

127. As further demonstrated herein, the Books and Records Demand, the Books and Records Action, and the Derivative Action are **Related Claims**, which are considered a single **Claim**, deemed to have been made on the date the first of those **Claims** was made against Keats and OSOM.

128. Thus, the Books and Records Demand, the Books and Records Action, and the Derivative Action collectively constitute a single **Claim**, first made on August 16, 2024 – prior to the Everspan Policy's **Policy Period**.

129. Accordingly, and for the reasons set forth herein, Everspan is entitled to a declaration that the Books and Records Demand, the Books and Records Action, and the Derivative Action collectively constitute one single **Claim** that was first made prior to the Everspan Policy's **Policy Period**, and in turn, that the **Claim** does not implicate coverage under the Everspan Policy

## COUNT III – DECLARATORY RELIEF
### (OSOM's Breach of Warranty Precludes Coverage Under the Clear Blue Policy)

130. Plaintiffs restate and incorporate by reference each and every allegation set forth in the preceding paragraphs as though set forth in full herein.

131. The allegations in the Books and Records Demand, the Books and Records Action, and the Derivative Action reveal that, at the time of executing the Warranty, Keats clearly had knowledge of facts, acts, errors and/or omissions which could have given rise (and indeed did give rise) to a **Claim** under the Clear Blue Policy.

132. Accordingly, Keats breached the Warranty and as a result, there is no coverage available to any of the Defendants under the Clear Blue Policy.

133. Accordingly, and for the reasons set forth herein, Clear Blue is entitled to a declaration that it has no defense or indemnify obligations to Defendants with respect to the Books and Records Demand, the Books and Records Action, and/or the Derivative Action.

## COUNT IV – DECLARATORY RELIEF
### (OSOM's Breach of Application Condition Precludes Coverage Under the Everspan Policy)

134. Plaintiffs restate and incorporate by reference each and every allegation set forth in the preceding paragraphs as though set forth in full herein.

135. The allegations in the Books and Records Demand, the Books and Records Action, and the Derivative Action reveal that, at the time of executing the Warranty, Keats clearly had

knowledge of facts, acts, errors and/or omissions which could have given rise (and indeed did) to a **Claim** prior to issuance of the Everspan Policy.

136. The Everspan Policy's definition of **Application** includes "all written materials and information … submitted, or made available by or on behalf of [OSOM] to [Everspan] in connection with underwriting of this Policy or any other policy issue by [Everspan], which this Policy is a renewal or replacement."

137. OSOM (via Keats) submitted the Warranty to Embroker (on Clear Blue's behalf) in connection with the extension of the Clear Blue Policy's **Policy Period**, and Everspan considered/relied on that Warranty during the underwriting of the Everspan Policy, which followed the Clear Blue Policy on the risk.

138. Likewise, at the time of executing the Application, Keats clearly had knowledge of the Books and Records Demand, the Books and Records Action, and the possibility/likelihood of OSOM going bankrupt within the next year, and Everspan considered/relied on that Application during the underwriting of the Everspan Policy.

139. Accordingly, Keats breached the Application condition and as a result, there is no coverage available to any of the Defendants under the Everspan Policy.

**140.** Accordingly, and for the reasons set forth herein, Everspan is entitled to a declaration that it has no defense or indemnify obligations to Defendants with respect to the Books and Records Demand, the Books and Records Action, and/or the Derivative Action.

## COUNT V – DECLARATORY RELIEF
### (Insured v. Insured Exclusion Bars Indemnity Coverage)

141. Plaintiffs restate and incorporate by reference each and every allegation set forth in the preceding paragraphs as though set forth in full herein.

142. The Clear Blue Policy and the Everspan Policy each excludes coverage for any **Claim** brought or maintained by or on behalf of a **Team Member** in any capacity.

143. A "**Team Member**" means, in relevant part, an "**Employee**."

144. An "**Employee**" is defined by the as "any natural person whose labor or service *was,* is or shall be engaged and directed by the **Insured Organization**, including full-time, part-time, seasonal, leased and temporary employees" (*emphasis added*).

145. The Books and Records Action, the Books and Records Action and the Derivative Action were brought by or on behalf of Ross.

146. Ross is a former employee and CPO of OSOM.

147. As such, Ross is a "**Team Member**" as that term is defined under the Clear Blue Policy and the Everspan Policy.

148. Accordingly, the Books and Records Demand, the Books and Records Action and the Derivative Action collectively constitute a **Claim** made by a **Team Member** in any capacity.

149. Therefore, indemnity coverage is barred under the Clear Blue Policy's and the Everspan Policy's Insured v. Insured exclusion.

150. Thus, in the event that this **Claim** is not barred from coverage by virtue of the defenses set forth in Counts I to IV,  coverage is still limited to **Defense Costs** only.

151. Therefore, Plaintiffs are  also entitled to a declaration that to the extent coverage is available, it is limited to **Defense Costs** only.

### COUNT VI – DECLARATORY RELIEF
### (Conduct Exclusion Bars Indemnity Coverage)

152. Plaintiffs restate and incorporate by reference each and every allegation set forth in the preceding paragraphs as though set forth in full herein.

153. The Clear Blue Policy and the Everspan Policy each excludes coverage for any **Claim** "for personal profit, remuneration, or financial advantage to which an **Insured** is not legally entitled," or "for any willful violation of any law, statute or regulation, or any deliberately fraudulent or criminal act, error or omission committed by an **Insured**."

154. Therefore, indemnity coverage is barred for the Books and Records Demand, the Books and Records Action and/or the Derivative Action under the Clear Blue Policy's and the Everspan Policy's Conduct exclusion upon entry of a final and non-appealable adjudication, adverse to the Defendants in any of the foregoing.

155. Thus, in the event that this **Claim** is not barred from coverage by virtue of the defenses set forth in a Counts I to V above, coverage is still limited to **Defense Costs** only.

156.    Therefore, Plaintiffs are once again entitled to a declaration that to the extent coverage is available, it is limited to **Defense Costs** only.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgement as follows:

a. Declaring that the Books and Records Demand, Books and Records Action, and Derivative Action constitute a single **Claim** under the Clear Blue Policy

b. Declaring that the single **Claim** does not implicate coverage under the Everspan Policy and thus, that coverage in unavailable thereunder;

c. Declaring that Keats breached the Warranty;

d. Declaring that Keats' breach of the Warranty precludes coverage under the Clear Blue Policy in its entirety;

e. Declaring that Keats breached the Everspan Policy's Application Condition;

f.   Declaring that Keats' breach of the Everspan Policy's Application Condition precludes coverage under the Everspan Policy in its entirety;

g.   Declaring that Clear Blue and Everspan have no defense or indemnity obligations to the Defendants with respect to the Book and Records Demand, the Books and Records Actions and/or the Derivative Action under the Clear Blue Policy and the Everspan Policy;

h.   Declaring that, to the extent that this Claim is not barred from coverage it its entirety, coverage is limited to **Defense Costs** only as a result of the Clear Blue Policy's and the Everspan Policy's Insured v. Insured Exclusion;

i.   Declaring that, to the extent that this Claim is not barred from coverage it its entirety, coverage is limited to **Defense Costs** only as a result of the Clear Blue Policy's and the Everspan Policy's Conduct Exclusion;

j.   Awarding Plaintiffs their attorneys' fees, costs, and disbursements in prosecuting this action; and

k.   Granting Plaintiffs any other and further relief as this Court may deem just, necessary and proper.

## <u>JURY DEMAND</u>

Plaintiffs Clear Blue Specialty Insurance Company and Everspan Indemnity Insurance Company hereby demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

Dated:      New York, New York
            July 17, 2025

Respectfully submitted,

*s/Michael Zigelman*
_____
Michael Zigelman, Esq.
**KAUFMAN DOLOWICH, LLP**

26

*Attorneys for Plaintiff Clear Blue*
40 Exchange Place, 20th Floor
New York, NY 10005
Direct: 212 485 9949
Cell: 718-986-1903
Email: MZigelman@kaufmandolowich.com


John Hopwood, Esq.
**GORDON REES SCULLY
MANSUKHANI LLP**
*Attorneys for Plaintiff Everspan*
1 Battery Park Plaza, 28th Floor
New York NY, 10004
Phone: 212-269-5500
Email: jhopwood@grsm.com


Daniel E. Feinberg, Esq.
**GORDON REES SCULLY
MANSUKHANI LLP**
1 N. Wacker Drive, Suite 1066
Chicago, IL 60606
Phone: 312-565-1400
dfeinberg@grsm.com


4912-0231-0230, v. 1